STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

MARCUS BROUSSARD, JR., ET AL.

VERSUS

MARTIN OPERATING PARTNERSHIP, ET AL.

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, NO. 83,406
HONORABLE ARTHUR J. PLANCHARD, DISTRICT JUDGE AD HOC

**********

JIMMIE C. PETERS
JUDGE

**********

Court composed of Oswald A. Decuir, Jimmie C. Peters, and Billy Howard Ezell, Judges.

AFFIRMED.

Gladstone N. Jones, III
Eberhard D. Garrison
H.S. Bartlett, III
Jones, Swanson, Huddell & Garrison, LLC
601 Poydras Street, Suite 2655
New Orleans, LA 70130
(504) 523-2500
COUNSEL FOR PLAINTIFFS/APPELLANTS:
    Marcus Broussard, Jr., et al.

**Stuart H. Smith**
**Michael G. Stag**
**Sean S. Cassidy**
**Smith Stag, LLC**
**365 Canal Street, Suite 2850**
**New Orleans, LA 70130**
**(504) 593-9600**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
    **Marcus Broussard, Jr., et al.**

**Warren A. Perrin**
**Perrin, Landry, deLaunay, Dartez & Ouellet**
**251 La Rue France**
**Lafayette, LA 70505**
**(337) 233-5832**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
    **Marcus Broussard, Jr., et al.**

**Al J. Robert, Jr.**
**643 Magazine Street, Suite 402**
**New Orleans, LA 70130**
**(504) 309-4852**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
    **Marcus Broussard, Jr., et al.**

**Tobin J. Eason**
**Weiss & Eason, LLP**
**Post Office Box 8597**
**Mandeville, LA 70470**
**(985) 626-5358**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **M-I, LLC d/b/a M-I SWACO**

**Robert T. Stewart**
**301 Congress Avenue, Suite 2000**
**Austin, TX 78701**
**(512) 495-6426**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **M-I, LLC d/b/a M-I SWACO**

**Glen G. Goodier**
**Jones, Walker**
**201 St. Charles Avenue, 48th Floor**
**New Orleans, LA 70170-5100**
**(504) 582-8000**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    **Continental Insurance Company**
    **Fidelity & Casualty Company**

**Daniel C. Hughes**
**126 Heymann Boulavrd**
**Lafayette, LA 70503**
**(337) 237-6566**
**COUNSEL FOR DEFENDANT/APPELLEE:**
      **Vista Resources, LLC**

**Gary P. Kraus**
**Onebane Law Firm**
**Post Office Box 3507**
**Lafayette, LA 70502-3507**
**(337) 237-2660**
**COUNSEL FOR DEFENDANT/APPELLEE:**
      **Vista Resources, LLC**

**Kenneth B. Givens**
**Post Office Box 8597**
**Mandeville, LA 70471-2008**
**(985) 626-5358**
**COUNSEL FOR DEFENDANT/APPELLANT:**
      **M-I, LLC d/b/a M-I SWACO**

**John Y. Pearce, III**
**Andrew T. Lilly**
**1100 Poydras Street, 33rd Floor**
**New Orleans, LA 70163**
**(504) 585-3200**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
      **Goldking Operating Company**
      **Dune Energy, Inc.**

**Thomas M. McNamara**
**Johnson Gray McNamara, LLC**
**Post Office Box 51165**
**Lafayette, LA 70505**
**(337) 412-6003**
**COUNSEL FOR DEFENDANT/APPELLEE:**
      **Atlantic Richfield Company**

**Robert T. Jorden, Jr.**
**Loulan J. Pitre, Jr.**
**Gordon Arata McCollam Duplantis & Eagan LLC**
**400 E. Kaliste Saloom, Suite 4200**
**Lafayette, LA 70508-8517**
**(337) 237-0132**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
      **Atlantic Richfield Company**
      **Cody Energy, LLC**

**George Arceneaux, III**
**Liskow & Lewis**
**Post Office Box 52008**
**Lafayette, LA 70505**
**(337) 232-7424**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
  **Atlantic Richfield Company**
  **Sinclair Oil Corporation**

**Bryan D. Scofield**
**Scofield & Rivera**
**Post Office Box 4422**
**Lafayette, LA 70502**
**(337) 235-5353**
**COUNSEL FOR DEFENDANT/APPELLEE:**
  **Smith International**

**Kevin W. Trahan**
**Ottinger Hebert LLC**
**Post Office Drawer 52606**
**Lafayette, LA 70505-2606**
**(337) 232-2606**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
  **Chevron USA, Inc.**
  **Saltex Exploration**

**Erin F. Parkinson**
**McGlinchey Stafford**
**601 Poydras Street, 12th Floor**
**New Orleans, LA 70130**
**(504) 586-1200**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
  **National Union Fire Insurance Company**
  **American Home Assurance Company**
  **American International Insurance Company**

**John E. W. Baay, II**
**Gieger, Laborde & Laperouse, LLC**
**701 Poydras Street, Suite 4800**
**New Orleans, LA 70139-4800**
**(504) 561-0400**
**COUNSEL FOR DEFENDANT/APPELLEE:**
  **Pacific Insurance Company**

**Andrew P. Sellers  Jr.**
**Post Office Box 15948**
**Baton Rouge, LA 70895**
**(225) 928-1951**
**COUNSEL FOR DEFENDANT/APPELLEE:**
  **Brammer Engineering, Inc.**

**PETERS, J.**

The original petition filed in this litigation lists the plaintiffs as follows: Marcus Broussard, Jr.; Flo Broussard; R. Brady Broussard; Whitestone, Inc., a Louisiana corporation; Joseph Vallee; Suzanne Vallee; and Vallee Land Company, LLC, a Louisiana limited liability company. In that original petition, the plaintiffs consolidated damage claims involving eight different tracts of immovable property (hereinafter often referred to as "tract," "property," or "land") and thirteen different defendants. The matter before us involves two of the plaintiffs, Whitestone, Inc. (Whitestone), which is owned by the Broussard plaintiffs, and Vallee Land Company, LLC (Vallee Land), which is owned by the Vallee plaintiffs; one of the eight tracts; and one of the thirteen defendants, M-I, LLC (which does business as both M-I Drilling Fluids LLC and as M-I SWACO and will be collectively referred to herein as "M-I"). The tract at issue in this litigation is located in Vermilion Parish, has been the subject of successive written commercial-lease contracts (hereinafter "lease" or "leases") dating back to 1955, and the two plaintiffs are its current record owners.

The plaintiffs brought suit against M-I as the current lessee to have the lease dissolved and to recover damages sustained to the property. A jury rejected all of the plaintiffs' claims against M-I, and after the trial court rejected their motions for a Judgment Notwithstanding the Verdict (JNOV) and, in the alternative, a new trial, they perfected this appeal primarily asserting in their seven assignments of error that the trial court erred in denying their post-trial motions. M-I also appealed, asserting one assignment of error. Additionally, M-I filed in this court a motion to dismiss the appeal. For the following reasons, we reject the motion to dismiss the appeal, but affirm the trial court's judgment in all respects.

## DISCUSSION OF THE RECORD

The property at issue in this litigation is approximately 3.7 acres located in Intracoastal City, Louisiana, on the Vermilion River near its intersection with the Intracoastal Waterway. Marcus A. Broussard, Sr., one of the original plaintiffs' fathers, acquired the land at a Sheriff's Sale in 1945, and a subsequent transaction gave R. J. Vallee, the predecessor of the other plaintiffs, ownership of a percentage of the property. The record contains no evidence of the use of the property between 1945 and August of 1955. When the first lease was executed in 1955, the owners of the 3.7 acres were Marcus A. Broussard, Sr. (undivided three-fourths interest) and R. J. Vallee (undivided one-fourth interest).

Between August 1, 1955, and July 31, 1975, Marcus A. Broussard, Sr. and R. J. Vallee leased most of the 3.7 acres[1] to Mud Supply Co., Inc. ("Mud Supply"). This original lease can best be described as basic. It provided for a ten-year term beginning August 1, 1955, with an option to renew for an additional ten years, but provided no information concerning the use Mud Supply was to make of the land or any conditions applicable to Mud Supply's obligations at the end of the lease with regards to the return of the property to the lessors. This lease terminated on July 31, 1975, without any dispute arising between the lessors and lessee concerning the lessee's full compliance with its terms.

In August of 1975, Marcus A. Broussard, Sr. and R. J. Vallee entered into a new lease (wherein the additional 90.5 feet of river frontage was added, thus expanding the area to include the full 3.7 acres at issue in this litigation) with Dresser Industries, Inc. d/b/a Oilfield Products Division of Dresser Industries, Inc.

---

[1] This lease describes the leased premises as having a 181 foot frontage on the Vermilion River. The subsequent leases at issue in this litigation reflect that an additional 90.5 feet of river frontage was added to the property description.

2

("Dresser"). This lease identified Dresser as the successor to Mud Supply and purported to cancel, supersede, and replace not only the original August 1955 lease, but also a second lease executed between the original parties on January 12, 1959.[2] The Dresser lease provided for a primary term of seven years beginning on August 1, 1975, with options to renew for two additional periods of seven years each. It also provided more detail than the 1955 lease in that it stated the following: "The premises may be used by Lessee for the purposes of Material Storage and Distribution and purposes incidental thereto and for any other lawful purposes not injurious to the reversion." This lease also addressed, for the first time, the lessee's reversion obligation at the end of the lease. The language concerning this obligation reads in pertinent part as follows:

> [A]t the expiration of the terms [Dresser] shall remove its goods and effects and peacefully yield up to Lessor said premises in as good order and condition as when originally delivered to it in 1955 and 1959 [respectively], excepting, however ordinary wear and tear and damage or loss caused by casualty, war, insurrection, public disorder, act of any governmental authority, fire, the elements, and any persons other than Lessee and those under its control.

The lease also contained a new provision addressing the ownership of any additions made to the property by the lessee during the term of the lease: "All improvements, alterations, and buildings (excluding bulkheads) which have been or will be placed or constructed upon the premises by Lessee shall be and remain property of Lessee. At [the] expiration of the term, Lessee, at its option, may abandon the same to Lessor or remove them from the premises."

By an act of donation inter vivos dated May 6, 1983, R. J. Vallee and his wife donated their interest in the 3.7 acres and other properties to their children, Joseph G. and Suzanne Vallee. Thus, at this point, the 3.7 acres was owned by

---

[2] The record does not contain a copy of the January 12 lease.

Marcus A. Broussard, Sr. (undivided three-fourths interest), Joseph G. Vallee (undivided one-eighth interest), and Suzanne Vallee (undivided one-eighth interest).

On December 22, 1995, Marcus Broussard, Sr., then a widower, donated his interest in 12.71 acres, which included the 3.7 acres at issue in this litigation, to his children: Marcus Broussard, Jr., Florence ("Flo") Broussard, and R. Brady Broussard. The ownership at this point in time was as follows: Marcus Broussard, Jr. (undivided one-fourth interest); Florence ("Flo") Broussard (undivided one-fourth interest); Brady Broussard (undivided one-fourth interest); Joseph G. Vallee (undivided one-eighth interest); and Suzanne Vallee (undivided one-eighth interest).

Dresser exercised the available options to renew and remained the named lessee until July 31, 1996. As with the Mud Supply lease, the termination of this lease gave rise to no dispute between the lessors and lessee concerning the lessee's performance under the lease or compliance with its terms.

The next lease took effect on August 1, 1996, but was actually executed on May 31, 1996. In this lease, Marcus A. Broussard, Jr., Brady Broussard, Flo Broussard Guidry, Mrs. R. J. Vallee, Joseph Vallee, and Suzanne Vallee leased the 3.7 acres to M-I. The lease provided for a primary term of five years beginning August 1, 1996, with no option to renew. While there is no direct evidence in the record to establish the exact relationship between Dresser and M-I, it is clear that a structural relationship existed because prior to the execution of the May 31, 1996 lease, M-I had taken over the operational responsibilities of the business activities transpiring on the 3.7 acres.

The M-I lease incorporated some provisions of the Dresser lease almost verbatim, but incorporated new provisions and added detail to others. With regard

4

to the obligation to maintain the premises, the M-I lease added the provision that "LESSEE will be responsible to maintain the said premises, to enhance its appearance, and to avoid any buildup of trash, etc., which might be deemed a public nuisance or against any government regulation or law." The lease carried forward the same language found in the Dresser lease concerning ownership of improvements, alterations, and buildings, but with the added language that "[a]ny buildings or improvements not removed within two months of the termination of this lease shall become the property of LESSORS." Additionally, this lease contained the specific provision that "LESSEE shall not make any additions or alterations to the premises without written permission of the LESSORS."

With regard to the use of the leased property, the lease did not feature the "for any other lawful purposes not injurious to the reversion" language found in the Dresser lease and instead simply provided that "[i]t is agreed and understood that LESSEE shall use the lease premises only for the purposes of Material Storage and Distribution and purposes incidental thereto."

Finally, with regard to M-I's reversion obligations, the lease provided the following:

> [A]t the expiration of the terms shall remove its goods and effects and peacefully yield up to the LESSORS said premises in as good order and condition as when originally delivered to it in 1955 excepting, however, ordinary wear and tear and damage or loss caused by casualty, war, insurrection, public disorder, act of any governmental authority, fire, [or] the elements.

Before this litigation began, more ownership transfers occurred between the property owners. By a credit deed dated December 22, 1997, or before the primary term of the M-I lease expired, Marcus A. Broussard, Jr., Flo Broussard, and Brady Broussard transferred their respective interests in the 3.7 acres to Whitestone. On that same day, the vendors in the credit deed executed a separate document

5

assigning all of their interest in the M-I lease to Whitestone. In October of 2004, Joseph G. Vallee and Suzanne Vallee transferred their interests in the 3.7 acres and other properties to Vallee Land. The transfer document was described as an act of exchange. Thus, at this point, the full ownership of the 3.7 acres belonged to Whitestone and Vallee Land in their respective undivided interests.

On two separate occasions before the Vallees transferred their interest to Vallee Land, Joseph G. Vallee, Suzanne Vallee Meaux, and Whitestone executed documents described as lease abstracts wherein they granted M-I two separate five-year extensions of the primary term of the May 31, 1996 lease. The first was executed in June of 2001 and extended the lease through July 31, 2006. The second was executed in November of 2003 and extended the lease through July 31, 2016.

This litigation began on May 17, 2005, when all of the combined plaintiffs filed a twelve-page petition seeking to recover damages from thirteen named defendants, including M-I. The petition claims that the individual defendants were liable for property damage on eight separate tracts of land varying in size from 3.62 acres to 703.893 acres. Thus, the petition attempts to assert thirteen individual claims involving eight different tracts of immovable property in a single pleading.

The 3.7-acre tract on the Vermilion River was one of the eight, and the allegations of damage to that tract were limited to the acts or omissions of M-I. While it is clear from the aforementioned acts of transfer that Whitestone and Vallee Land were the sole owners of the 3.7-acre tract when the original petition was filed, the pleadings' structure make it difficult to determine the actual parties at interest in the thirteen separate claims.

With regard to M-I's liability for damages to the plaintiffs, the original petition and subsequent amending petitions assert that M-I and its predecessor corporations had conducted operations on the 3.7-acre tract since 1975, and during that time had "knowingly, willfully, wantonly, and negligently" caused the property "to become contaminated [by] barium, production and drilling wastes, and other hazardous, toxic and carcinogenic chemicals." This contamination, the petition asserted, was caused by the negligent and improper discharge of "drilling fluid and other chemicals associated with the oil and gas industry onto the property." Furthermore, the plaintiffs charged that M-I had intentionally disposed, dumped, buried, and hid solid hazardous waste on the property. These actions, according to the plaintiffs, constituted negligent and intentional wrongdoing. The plaintiffs also asserted that M-I used the property "for purposes other than those intended by the lease agreement," and that it violated the terms of the lease in numerous other ways. For all of M-I's acts and omissions, the plaintiffs sought dissolution of the lease and a judgment for damages associated with the breach of the lease as well as damages in tort.

As would be expected, given the nature of the litigation and the number of parties involved, the pretrial record of these proceedings is voluminous. Hearings where all of the defendants argued the same pretrial motions occurred, and the trial court faced the arduous task of separating the legal arguments from the individual facts of the separate claims. Additionally, the pretrial record resulted in conflicting judgments arising over time. For example, on January 29, 2007, a hearing was held wherein the trial court addressed multiple preliminary motions filed by the various defendants, including an exception of prematurity. The transcript of the January 29, 2007 hearing is not a part of the appeal record, but the minutes and May 14, 2007 judgment arising from that hearing reflect that the trial court

7

rendered the following ruling on all of the prematurity exceptions that were filed, including one filed by M-I:

> IT IS HEREBY ORDERED that the Dilatory Exception of Prematurity is SUSTAINED IN PART and OVERRULED IN PART. The Exception of Prematurity is overruled as to all claims of Plaintiff[s] except those claims involving the defendant[] lessee's obligations to restore lands on which operations are ongoing. The claim for restoration is hereby dismissed.

However, on October 28, 2010, this issue was revisited and the trial court reversed its ruling on the prematurity issue. The November 12, 2010 judgment arising from the October 28, 2010 hearing reads, in pertinent part, as follows:

> IT IS FURTHER HEREBY ORDERED that this Honorable Court recognizes its prior ruling as to the restoration claim in granting the prior M-I Exceptions of Prematurity for ongoing leases but M-I's Motion in Limine to limit plaintiffs from seeking damages relating to its claims for restoration, et al. is DENIED.

The final act of transfer evidencing ownership of the property by the plaintiffs occurred on December 8, 2010, or five days before the trial on the merits began. On that day, by separate acts of donation, the Broussard family members and the Vallee family members transferred to Whitestone and Vallee Land, respectively, the following described property:

> All rights, claims, actions, causes of action, and demands, including without limitation claims for damages, that Donors have or may have against any and all of the defendants in the suit entitled "*Marcus Broussard, Jr. et al. vs. Martin Operating Partnership, et al.*, pending in the 15th Judicial District Court, Vermilion Parish, State of Louisiana, Docket No. 83406, Division "C."

The trial testimony established that the purpose of these documents was to clarify ownership of all claims.[3]

---

[3] Despite full ownership of the 3.7 acres being vested in Whitestone and Vallee Land, the plaintiffs' pleadings still designate the parties at interest as the "Broussard" plaintiffs and the plaintiffs' brief to this court lists all the parties in the original suit as appellants.

On December 13, 2010, trial by jury began. Twelve trial days, twenty-one witnesses, and 148 exhibits[4] later, the matter was submitted to the jury with a jury verdict form containing six interrogatories. Slightly over three hours after the matter was submitted, the jury returned its verdict rejecting all of the plaintiffs' claims. The verdict form and instructions provided to the jury reads, and was completed, as follows:

TO THE MEMBERS OF THE JURY:

This Jury Verdict Form must be filled out in accordance with the directions given by the court. When nine jurors agree on the answers to the questions that must be answered, your foreperson should sign and date the Form and then notify the court.

## INTERROGATORIES ON BREACH OF CONTRACT CLAIMS

1. Do you find by a preponderance of the evidence that the Defendant is in breach of the "Commercial Lease" and caused damage to the Plaintiffs' property?

Yes _____          No _✔_

## INTERROGATORIES ON TORT CLAIMS

2. Do you find by a preponderance of the evidence that the Defendant was negligent with respect to the described property in the "Commercial Lease"?

Yes _____          No _____

*(If you answered "yes" to this question, go to #3; if "no," then proceed to #4)*

3. Do you find by a preponderance of the evidence that the Defendant's negligence was a cause of any damage to the Plaintiffs' property with respect to the described property in the "Commercial Lease"?

Yes _____          No _✔_

---

[4] The number of exhibits listed do not include those which were referred to but not offered into evidence, nor those which were rejected as evidence and proffered.

**INTERROGATORIES ON COMPENSATORY DAMAGES**

4.  Please state the amount of money necessary to fairly compensate the Plaintiffs and remediate the described property in the "Commercial Lease":

$_____

**INTERROGATORIES ON PUNITIVE (EXEMPLARY) DAMAGES**

**Answer Question #5 only if you have answered "yes" to #2 and #3:**

5.  Do you find that between September 4, 1984[,] and April 16, 1996, the Defendant acted with wanton or reckless disregard for the public safety in the storage, handling, or transportation of hazardous or toxic substances on the property described in the "Commercial Lease"?

Yes _____        No _____

*(If you answered "yes" go to question #6.)*

6.  State the total amount of punitive damages you find that the Defendant should pay the Plaintiffs for damage to their property:

$_____

The jury foreperson signed and dated this verdict form and returned it in open court on January 6, 2011. Neither the plaintiffs nor M-I initially objected to, or even noted, the fact that the jury failed to answer the second interrogatory.

Based on this verdict, the plaintiffs filed a motion for JNOV and, alternatively, for a new trial. The trial court subsequently denied both motions. The trial court rendered a final judgment on March 16, 2011,[5] and the plaintiffs timely perfected this appeal.

In their appeal, the plaintiffs[6] raised seven assignments of error:

---

[5] The March 16 judgment was designated an amended judgment. An initial "Final Judgment" had been rendered on February 10, 2011. The only difference between the initial judgment and the amended judgment is that the amended judgment states that the jury verdict form is made a part of the judgment.

[6] We again point out that while the plaintiffs' pleadings continue to refer to the plaintiffs in such a way as to suggest that a right of recovery remains in the individuals who previously

10

1. The district court erred in denying the Broussards' motion for JNOV on their tort claim, and for entering a judgment on the jury's verdict "that Defendant's negligence was not a legal cause of any damage to the Plaintiffs' property," where M-I's counsel and witnesses repeatedly conceded causation and where M-I did not put on a defense on causation.

2. Alternatively, if this Court were to interpret the jury's verdict as not resulting in a finding of negligence to the jury's failure to completely fill out the verdict form, then the district court erred in denying the Broussards' motion for new trial under Louisiana Supreme Court's intervening decision in *Wegener v. Lafayette Ins. Co.*, 60 So.3d 1220 (La.2011).

3. The district court also erred in failing to properly instruct the jury on the applicability of strict liability and negligence *per se*, particularly for the 1996 contamination damages on the property.

4. The district court erred in denying the Broussards' motion for JNOV on their contract claim, and for entering judgment on the jury's verdict that the Defendant "did not breach the 'Commercial Lease' and cause damage to the Plaintiffs' property," where there is overwhelming evidence on the record that M-I breached the lease through multiple statutory and regulatory violations and through conducting manufacturing operations on the property.

5. The district court erred in denying the Broussards' motion for new trial on the basis of M-I's significant discovery abuse.

6. The district court erred in refusing to allow discovery for or admit evidence of M-I's other bad acts for purposes of the *res gestae* factors under Louisiana Code of Evidence art. 404(B)(1) (motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident).

7. The district court erred in its judgment to "dismiss[] with prejudice all causes of action asserted in the plaintiffs' original and all supplemental Petitions," where the district court's dismissal includes a dismissal of the Broussards' claim for statutory damages under La.R.S. § [30]:2276(G)(3), as to which the district court failed to conduct a hearing, and as to which claim the Broussards have presented overwhelming evidence of M-I's obligation to pay all costs incurred by the Broussards in developing and implementing an approved clean-up plan for the property.

---

owned the property, all of the evidence points to the fact that the ownership of all rights in this litigation rests with Whitestone, Inc. and Vallee Land Company, LLC.

In response to the plaintiffs' appeal, M-I filed a partial motion to dismiss the appeal. This motion was referred to the merits and will be decided herein. M-I has also appealed from the trial court judgment, alleging one assignment of error couched in the following language:

> M-I L.L.C. d/b/a M-I SWACO, and its predecessors, have been operating on the property in question for over fifty years pursuant to a series of leases. The current lease, which expires in 2016, was written by the lessor and specifically provided that the lessee has a restoration obligation upon expiration. This is a claim for restoration damages.

> M-I contends that the lease is the contract between the parties and plaintiffs' claims in tort and contract are governed by the contract. Since the contract specifies a restoration obligation upon expiration, plaintiffs cannot seek damages in tort or contract for restoration until the end of the lease, i.e., the case is premature. Therefore, the trial court should have dismissed the case or disallowed evidence of restoration damages as suit was filed based upon restoration damages and should have been dismissed. Further, several interlocutory Judgments during discovery ruled that for ongoing leases (as originally there were multiple parties) restoration damage claims were dismissed.

## OPINION

### *Scope of Review*

Most of the plaintiffs' assignments of error on appeal address the trial court's failure to grant their JNOV and/or motion for new trial. In *Trunk v. Medical Center of Louisiana at New Orleans*, 04-181, pp. 4-5, (La. 10/19/04), 885 So.2d 534, 537, the supreme court again explained the standard under which a JNOV should be decided at the trial level:

> The use of JNOV is provided for by La. C.C.P. art. 1811. A JNOV may be granted on the issue of liability or on the issue of damages or on both issues. La. C.C.P. art. 1811(F). Article 1811 does not specify the grounds upon which the district court may grant a JNOV; however this court has set forth the criteria to be used in determining when a JNOV is proper as follows:

>> [A] JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict. The motion should

be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. The motion should be denied if there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.

*Joseph v. Broussard Rice Mill, Inc.*, 00-0628, pp. 4-5 (La.10/30/00), 772 So.2d 94, 99 (internal citations omitted). *See also VaSalle v. Wal-Mart Stores, Inc.*, 01-0462, p. 11 (La.11/28/01), 801 So.2d 331, 338-39. The rigorous standard of JNOV is based upon the principle that "when there is a jury, the jury is the trier of fact." *Joseph*, 00-0628 at p. 5, 772 So.2d at 99 (quoting *Scott Hospital Serv. Dist. No. 1*, 496 So.2d 270, 273 (La.1986)).

Additionally, "[i]n reviewing a JNOV, an appellate court must first determine whether the district court erred in granting the JNOV by using the above-mentioned criteria in the same way as the district judge in deciding whether to grant the motion." *Id.* However, a judgment denying a motion for JNOV will only be reversed if the denial was manifestly erroneous. *Peterson v. Gibraltar Sav. and Loan*, 98-1601, 98-1608 (La. 5/18/99), 733 So.2d 1198. Therefore, we evaluate the trial court's denial of the JNOV under the manifest error, clearly wrong standard of review. As noted in *Peterson*, 733 So.2d at 1203:

A jury's finding of fact may not be reversed absent manifest error or unless clearly wrong. *Stobart v. State of Louisiana, Through Department of Transportation and Development*, 92-1328 (La.4/12/93), 617 So.2d 880. The reviewing court must do more than just simply review the record for some evidence which supports or controverts the trial court's findings; it must instead review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. *Stobart* at 882. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one[.] *Id.* The reviewing court must always keep in mind that "if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would

13

have weighed the evidence differently." *Stobart* at 882-83, citing *Housley v. Cerise*, 579 So.2d 973 (La.1991) (quoting *Sistler v. Liberty Mutual Ins. Co.*, 558 So.2d 1106, 1112 (La.1990)).

With regard to the motion for new trial, the supreme court, in *Joseph v. Broussard Rice Mill, Inc.*, 00-628, pp. 14-15 (La. 10/30/00), 772 So.2d 94, 104 (footnotes omitted) (alteration in original), stated the following:

> As provided in LA.CODE CIV. PROC. art. 1972, a new trial shall be granted, upon contradictory motion, where (1) the verdict or judgment is contrary to the law and evidence; (2) important evidence is obtained after trial; or (3) the jury was either bribed or behaved improperly. Moreover, pursuant to LA.CODE CIV. PROC. art. 1973, a new trial may be granted if there is good ground therefor except as otherwise provided by law.
>
> In *Lamb v. Lamb*, 430 So.2d 51 (La.1983), we set forth the standard for granting a new trial pursuant to LA.CODE CIV. PROC. art. 1973. There we stated:
>
> > A proper application of this article necessitates an examination of the facts and circumstances of the individual case. When the trial judge is convinced by his examination of the facts that the judgment would result in a miscarriage of justice, a new trial should be ordered. . . . We have recognized that the [trial] court has much discretion regarding this determination. However, this court will not hesitate to set aside the ruling of the trial judge in a case of manifest abuse.
>
> *Lamb*, 430 So.2d at 53.
>
> In a motion for new trial under either LA.CODE CIV. PROC. arts. 1972 or 1973, the trial court may evaluate the evidence without favoring either party; it may draw its own inferences and conclusions; and evaluate witness credibility to determine whether the jury had erred in giving too much credence to an unreliable witness. *Smith v. American Indem. Ins. Co.*, 598 So.2d 486 (La.App. 2 Cir.), *writ denied*, 600 So.2d 685 (La.1992). The applicable standard of review in such matter is whether the trial court abused its discretion. *Anthony v. Davis Lumber*, 629 So.2d 329 (La.1993).

### *Summary of the Trial Evidence*

The record establishes that regardless of whether the lessee was Mud Supply, Dresser, or M-I, the use of the 3.7 acres included the operation of a drilling-mud processing plant to service the Louisiana inland water and offshore oil and gas

14

industry. Drilling mud is an integral part of the oil and gas drilling process. It is either water or oil based and often contains additives such as viscosifiers, emulsifiers, and lubricants, as well as substances such as barite to give it weight. The purpose of drilling mud is to maintain the integrity of the borehole of the well by building a mud cake on the outside of the hole to prevent it from collapsing. It also functions as a weight fluid to prevent the formation fluids from rising to the surface. Because drilling mud is constantly being circulated down the drill pipe, it picks up cuttings and fluids generated from the drilling process, as well as naturally occurring substances found in the subsurface.

Since 1955, the chemicals and supplies (hereinafter sometimes referred to collectively as the "product") necessary for the lessee's operations have been delivered in sacks and stored on the property until needed. The product used by M-I contains barium sulfate, chromium, traces of lead, and zinc bromide, with barium sulfate being the primary ingredient. Additionally, during the period from 1955 through the 1970s, some drilling mud suppliers added arsenic to the final mixture as an inhibitor. The evidence in the record does not address Mud Supply's use or nonuse of arsenic.

When a customer placed an order for drilling mud, the lessee would mix the drilling mud to the customer's specifications on the premises and then transport the finished product to the drilling site. It was not uncommon for the stored product to exceed the warehouse storage capacity and, consequently, the sacks would be stacked in the open on wooden pallets. Sometimes, but not always, the sacks would be encased in plastic shrink wrap. However, because the sacks were not always protected from the elements and because the handling of the sacks was subject to human error, accidents occurred and torn sacks would regularly cause the product to be spread across the surface of the 3.7 acres. Additionally, during

15

the mixing process, spills would occur. Most, but not all, of these spills were minor.

*Mud Supply and Dresser Lease History*

Storing and mixing the product, and then distributing the final mixture of drilling mud appears to have been the only business activity on the 3.7 acres during the time when Mud Supply was the lessee. However, when Dresser/M-I[7] became the lessee, it expanded business activity to include storing and recycling used drilling mud and completion fluids. Both of these activities entailed different spill risks from the basic drilling mud facility operated by Mud Supply.

The recyclable drilling mud was shipped from an inland water or offshore drilling rig to the 3.7-acre tract and stored in tanks. It would then be treated to remove the numerous impurities and chemicals picked up downhole on the drilling rig, and then remixed after being purged and resold for use.[8] The impurities and chemicals included oilfield brine extracted in the drilling process, the various chemicals found in the drilling fluids, and the cuttings and oil contaminants encountered in the drilling process. Evidence introduced at trial established that one could expect to find a number of heavy metals in the oilfield brine, including lead, arsenic, barium, chromium, cadmium, copper, silver, and zinc. Most of these were removed at the drilling site through the recycling process.

In 1994, Dresser/M-I completed a new oil and gas related facility on the 3.7 acres which was then used for receiving, storing, and recycling used completion fluids from inland waterway and offshore drilling rigs. Completion fluids are clear,

_____

[7] We use this designation because, while Dresser is the named lessee, early in the primary term, M-I was operating all of the business interests on the 3.7-acre tract.

[8] It is not clear from the record when this business activity began, but tanks associated with the activity appeared on an aerial photograph taken of the 3.7 acres in 1981.

saturated salt solutions which are pumped downhole to complete a well. These completion fluids are exposed to the same contaminating substances as the recyclable drilling mud, and the purpose of the recycling process is to remove the contaminants and resell the purged completion fluids to the drilling rig. In addition to the other substances and chemicals to which it might be exposed, the completion fluids themselves are largely zinc bromide, a pollutant which can suffocate marine life.

The introduction of the recycling operations for drilling mud and completion fluids to the 3.7 acres exposed the property to another byproduct of the drilling process referred to as naturally occurring radioactive materials or "NORM." These radioactive materials often exist downhole and can become mixed with the drilling mud and completion fluids used during the drilling process. If they do become mixed, the recycling operation must address their presence and remove them from the recycled product. NORM can also be found in the sand/scale mineral buildup accumulating in drilling pipes and oilfield equipment. When NORM appears in the sand/scale mineral-buildup, it is referred to as technologically enhanced, naturally occurring radioactive material or "T-NORM," and is more radioactively concentrated than basic NORM. The amount of NORM produced by a drilling operation varies depending on a number of factors, including the nature of the geological formation. The oil and gas formations found in the Gulf of Mexico off the coast of Louisiana generally have high levels of NORM.

The dangerous nature of NORM and T-NORM was recognized by the Louisiana Department of Environmental Quality (DEQ) in the 1980's, and DEQ promulgated rules and regulations addressing the problem. However, both before and after DEQ took these steps relating to NORM and T-NORM, Dresser/M-I did not consider radioactive waste to be a problem which needed to be addressed

17

because its policy was to not accept any NORM contaminated material from offshore in its recycling operations. T-NORM did not have to be addressed, Dresser/M-I reasoned, because its policy prohibited offshore equipment from being stored on the 3.7-acre tract. Furthermore, Dresser/M-I took the position that when the DEQ rules and regulations were promulgated, they only applied to the drilling process directly and, therefore, did not apply to the ongoing operations on the 3.7 acres. With this policy in mind, neither Dresser nor M-I ever obtained the appropriate permit from DEQ to handle NORM or T-NORM.

Neither Mud Supply nor Dresser kept adequate records concerning spills occurring on the property from August of 1995 through July 31, 1996. In fact, there exists no evidence of any spill, large or small, during the time Mud Supply leased the property. The remaining evidence establishes the existence of only two significant spills occurring on the property before M-I's lease took effect on July 31, 1996: a ten-barrel spill of oil-based drilling fluids on April 22, 1988; and a 6,000 barrel spill of nonhazardous oilfield waste ("NOW") in the summer of 1994. There is no evidence concerning how the first spill was addressed, but significant evidence exists relating to the second.

On September 26, 1994, M-I (not Dresser, although Dresser remained the lessee at this time) applied for a permit from DEQ to dispose of 6,000 barrels of NOW.[9] According to Richard Bourque, M-I's site manager at the time, the waste consisted of oil, mud, and cuttings that had escaped from one of the mixing tanks. He participated in removing the spilled product as well as approximately six to eight feet of soil at the spill site. Mr. Bourque testified that during the excavation

---

[9] Initially, M-I applied for a permit to dispose of 100 barrels of NOW waste on August 17, 1994. It amended this amount to 1500 barrels on September 20, 1994, and further amended it to 6000 barrels on September 26, 1994.

process, he wore protective gear but was not aware of any testing that may have been performed on the removed soil.

Blufford Joseph Cart, III, who held the position of M-I's Quality Health Safety Environmental Manager at the time of trial but had not participated in the evaluation or cleanup of the 1994 spill, testified that it was his understanding that the six to eight feet of soil was not removed because it was a part of the NOW resulting from the spill, but because it was contaminated. He understood that the spill occurred at the construction site of the completion fluids plant and when some of the soil was excavated, it was found to be contaminated.

To further complicate matters, Art Leuterman, M-I's manager of its Environmental Control Group since 1983, testified that he was aware of the 1994 spill as a result of reviewing the DEQ permit request. According to his understanding of the request, the spilled material was removed pursuant to the permit, but the underlying soil was not excavated as a result of contamination. Instead, it was excavated to construct the foundation for the completion fluid plant. He acknowledged, however, that the removed soil contained arsenic, chromium, and zinc levels which exceeded state established standards.

The 1994 spill also revealed the flawed nature of the Dresser/M-I policy concerning NORM because, despite the stated policy, NORM had already found its way onto the 3.7 acres. According to Marc Adair Churan, M-I's Analytical Services Group Manager situated in Houston, Texas, his lab performed radioactivity testing on three samples provided to him in August of 1994, in which measurable amounts of radioactive material were detected. NORM apparently found its way onto the property because, instead of testing the material it received, M-I relied on the assertions of the inland waterway and offshore facilities returning the used product and its understanding of the historical data associated with a

19

particular formation to determine in advance whether the product would be NORM free and, thus, accepted on the property.

With regard to improvements on the leased premises, neither the Mud Supply lease nor the Dresser lease placed any restrictions on the construction needs of the lessees' operations. The testimony and various photographs introduced into evidence establish a significant history of construction and renovation projects between August of 1955 and July 31, 1996. When Dresser's lease expired on July 31, 1996, the structures and facilities on the 3.7 acres included, but were not limited to, the completion fluids plant, living quarters for the employees, office space, an expanded warehouse, a crane, bulkheads, and bulk barite tanks. Additionally, a significant portion of the property was cemented over.

### *Pre-suit M-I Lease History*

When Dresser's lease expired on July 31, 1996, the use of the property had already been expanded to an operation that not only stored, mixed, and supplied drilling mud and completion fluids to inland water and offshore oil and gas drilling rigs, but also recycled both drilling mud and completion fluids. Also, it is evident that the property already contained significant contaminants derived from the continuing activity begun on August 1, 1955. No testing was performed by anyone between the end of the Dresser lease and the beginning of the M-I lease to establish a baseline for comparison with the contamination situation existing when the litigation began. Additionally, although the Dresser lease contained a clause that required Dresser to deliver the property to the lessors in its pre-1955 condition, this requirement was ignored by the lessors, Dresser, and the new lessee.

Dresser also apparently abandoned the improvements, alterations, and buildings on the 3.7 acres to the lessors. As previously stated, although Dresser's lease provided that improvements, alterations, and buildings which it constructed

on the property would remain Dresser's property, it also provided that if Dresser did not remove them at the end of the lease, they would become the lessor's property. Thus, under the specific terms of the Dresser lease, the lessors became the owners of the improvements, alterations, and buildings constructed during the Dresser lease.

Also, as previously stated, when M-I became the lessee effective August 1, 1996, the language concerning improvements, alterations, and buildings found in Dresser's lease was modified only to state that M-I had two months from the end of the lease to remove any improvements, alterations, or buildings it added to the property or they too would become the property of the lessor. The M-I lease did not address the ownership of the improvements, alterations, and buildings constructed during the Dresser lease. The record establishes that while there seems to have been movement of existing structures during the M-I lease, there appears to have been little or no new construction.

When M-I became the named lessee, there appeared to be an immediate positive change in corporate policy concerning record keeping and pollution control. Bryan Benoit became M-I's Environmental Coordinator in mid-1996, and when he assumed his duties, his responsibilities included bringing M-I sites into compliance with the various federal and state entities having jurisdiction over its operations. At trial, he suggested that the primary problems at the 3.7-acre site included the lack of training of the facility personnel concerning the handling of waste; permit requirements not being properly met; the lack of a storm water permit; the absence of a spill prevention control and countermeasures (SPCC) plan; and the failure to have a United States Coast Guard Facility Operational Manual on site.

21

Mr. Benoit went to work on these deficiencies, and within sixty days of assuming his new position, he had satisfied the Coast Guard with regard to the operational-manual issue and, before he left M-I's employment in 2002, he had written an SPCC plan for the site. Additionally, he had worked to update and/or obtain the necessary solid and hazardous waste permits and to implement waste-handling training for the employees. Although he applied for numerous permits from both the state and federal agencies, Mr. Benoit testified that M-I was still waiting for the State of Louisiana to act on its water permit application when he left M-I's employment in 2002.

According to Mr. Cart, in December of 2004, or over one and one-half years before M-I became the named lessee, the company implemented a Waste Management Plan specifically for the 3.7-acre tract which identified potential streams of waste to include: (1) empty sacks, plastics, and paper; (2) empty drums previously containing non-hazardous product; (3) small amounts of liquid from the mixing pit; (4) small spills from the diesel mud plant; (5) solids and water from the oil and water separator; and (6) dust and dry chemical residue in the environment of the warehouse. Included in an appendix to the plan was a list of chemical compositions found on the 3.7 acres while formulating the plan. These included alkalinity ("Ph"), total petroleum hydrocarbons ("TPH"), benzene, arsenic, barium, cadmium, chrome, copper, lead, mercury, molybdenum, nickel, selenium, silver, and zinc.

As one might expect on such a labor intensive site, accidents and spills continued to occur despite the implementation of the new company plans and policies. A major spill occurred in August of 2000, when, after a large rain event, a tank valve was left open and approximately 200 gallons of zinc bromide spilled into a retaining area surrounding the tank and mixed with the rainwater. When the

22

rainwater was drained from the retaining area pursuant to the appropriate permit, the zinc bromide flowed out, as well. Mr. Benoit testified that the surface was cleaned immediately and he took samples to determine the effect the spill had on the soil. When tested, these samples were found to contain barium, chromium, sodium bichromate, and zinc in amounts that exceeded DEQ standards. When he sought authority for further remediation action, he was informed that the surface should be cleaned immediately, but that the more significant subsurface contamination would be addressed at the end of the lease.

Another significant spill occurred on December 30, 2004, when a vessel being loaded with drilling mud tilted from the load and approximately forty barrels of drilling mud spilled into the Vermilion River. However, according to Billy Alston, M-I's Asset Manager and former site manager, absorbent booms and pads were deployed within fifteen to twenty minutes of the spill.

With regard to NORM, in 1997 Mr. Benoit recorded readings establishing its presence in two twelve-foot long flow lines running from a tank containing recyclable drilling mud. On another occasion, Mr. Benoit observed workers washing a piece of oilfield equipment containing three to four inches of accumulated sand. The water used to wash the equipment flowed into a ditch and ultimately drained into the Vermilion River. Not only had the equipment and sand not been tested for T-NORM, but the lessee had no discharge permits for purposes of draining the water into the river. Mr. Benoit's opinion on the subject of NORM testing differed from his employer. He was of the opinion that even though M-I did not accept NORM-contaminated material, it should test the recyclable materials it received to make sure its reliance on the drilling rig testing was well founded.

23

*Post-suit Activity*

When they filed suit, the plaintiffs had only a suspicion that the property was contaminated. In fact, it was not until August of 2008, when William Kimbrell, a Baton Rouge, Louisiana petroleum engineer and geological consultant retained by the plaintiffs, completed an extensive evaluation of the 3.7 acres that revealed the extent of the contamination. With regard to why the suit was filed in May of 2005, instead of waiting until the lease expired on July 31, 2016, Marcus Broussard, Jr. testified that the suit was brought to evict M-I so that the lessors could clean up the site. He explained that he was eighty-two years old and did not wish to leave the cleanup problem to his children and grandchildren.

Mr. Broussard testified that the lessors recognized that M-I had made some attempts to clean up the site, but they were convinced that the efforts were only to meet DEQ standards and not to return the property to the 1955 pre-lease condition. He also asserted that M-I failed to maintain the property's cosmetic appearance as required by the lease; that the property was being used for business activity not authorized by the lease; that M-I had made alterations to the property without first obtaining written permission as required by the lease; and that M-I failed to follow the applicable regulations associated with its commercial operation as evidenced by its flawed NORM policy. While the plaintiffs wanted the lease dissolved, they did not want M-I to be responsible for the restoration of the property to 1955 pre-lease standards. Instead, they wanted M-I to pay them the cost of restoration and they would assume the responsibility for that activity themselves. Mr. Broussard testified that at the time of trial, the plaintiffs had sustained no monetary loss.

To begin his analysis, Mr. Kimbrell performed a background evaluation of the 3.7 acres by studying historical aerial photographs and related documents to develop a sense of the property's transition from 1955 to the time of his

investigation. On August 22, 2008, he performed a physical walkover of the property and then took soil samples from over sixty locations at depths varying from five to eighteen feet. Additionally, he took twenty-two samples from areas as far as two miles from the 3.7-acre site to establish a "background" benchmark.[10] He then compared the current level of a particular element found in the 3.7-acre tract to the background amount one would have expected to find prior to August 1, 1955.

In his analysis, Mr. Kimbrell made the assumption that any chemical present in quantities exceeding double the background concentration would require removal. According to Mr. Kimbrell, all of the chemicals compositions one might expect to find in the primary and recycling activities were found in at least two times background and at significant depths in the soil. Of particular significance to Mr. Kimbrell were the excess concentrations of arsenic and barium found throughout the property. During his walkover of the property, Mr. Kimbrell detected evidence of radioactivity, but found it elevated to NORM in only one area.

In Mr. Kimbrell's opinion, M-I had merely cleaned the surface when it addressed spills on the property because contaminants were found at significant depths. To return the property to 1955 pre-lease standards would require the excavation of the contaminated soil and its removal to a commercial disposal facility. He testified that this process would cost approximately $14,500,000.00.

Dr. William Sawyer, a Sanibel, Florida toxicologist and forensic medicine expert, evaluated Mr. Kimbrell's findings and concluded that five of the thirty confirmed human carcinogens were present on the 3.7 acres. He identified these

---

[10] As explained by the many witnesses who used the term "background," it is the level of a particular element that one would expect to find naturally occurring in the environment being tested.

five as arsenic, benzene, nickel, chromium VI, and radium and found that all were present in concentrations which exceeded twice the background as identified by Mr. Kimbrell. It was his opinion that the arsenic concentration was excessive and above the range considered safe. He also agreed with Mr. Kimbrell that the concentration levels of barium were exceedingly high and constituted a health risk. He agreed that the site warranted cleanup and opined that Mr. Kimbrell's cleanup restoration plan adequately addressed the health risks he noted in his evaluation.

The plaintiffs retained Stanley Waligora, Jr., an Albuquerque, New Mexico health physicist with expertise in radiation, to characterize the radiological conditions on the 3.7 acres and to recommend solutions for any problems he might find. Based on the material provided to him, Mr. Waligora concluded that NORM was handled at the site and that radium in the area where NORM was found was elevated beyond background. Given his conclusion that NORM was being processed on the 3.7 acres, he was of the opinion that Mr. Kimbrell's cleanup plan should be implemented to prevent further buildup, but that the goal of the plan would be hard to reach.

Dr. Paul H. Templet, the former Secretary of DEQ and a retired professor of Chemical Physics at Louisiana State University in Baton Rouge, Louisiana, testified concerning the DEQ regulations pertaining to NORM and his opinion regarding the extent of NORM contamination on the 3.7-acre tract. Dr. Templet additionally was the Secretary of DEQ in 1988, when the rules and regulations pertaining to NORM were promulgated.

After reviewing the data compiled by Mr. Kimbrell, Dr. Templet concluded that the site was contaminated with high levels of barium, chromium, lead, zinc, arsenic, TPH, and radium. Additionally, based on Mr. Kimbrell's radiation data, he concluded that despite its policy to the contrary, M-I regularly handled NORM-

26

contaminated material and equipment on the premises. In fact, according to Dr. Templet, the DEQ NORM regulations were intended to apply to facilities such as M-I's and not just to drilling locations. Thus, M-I's policy concerning NORM testing was a continuing violation of DEQ regulations. The policy as implemented by M-I created, according to Dr. Templet, a foregone conclusion that NORM contamination would affect the site.

At some point after this litigation began, M-I prepared a Risk Evaluation Corrective Action Plan (RECAP) and submitted it to DEQ for approval. Dr. Templet described a RECAP plan as a procedure for deciding how to clean a contaminated site to a remediation point that would allow a company to be released from future liability. The plan itself addresses the problems present on the given tract of land, including the nature and extent of the contamination; the proposed cleanup steps to be taken; and the anticipated result of those efforts. He testified that M-I's plan proposed a cleanup that would meet current industrial standards, but which would fall far short of the 1955 pre-lease standards. Furthermore, a RECAP plan does not cover NORM. According to Mr. Kimbrell, a RECAP cleanup would meet minimum standards, but is designed to avoid interference with property rights or contractual obligations.

The company representatives and expert witnesses who testified for M-I basically agreed that the 3.7 acres contained levels of chemical compositions that exceeded the appropriate limits and also generally agreed that M-I's commercial activity contributed to that contamination. Mr. Leuterman acknowledged that the arsenic, chromium, and zinc exceeded DEQ standards, but disagreed that M-I contributed to the radium contamination. He suggested that the radium present was nothing more than background. Mr. Leuterman stated that M-I had not performed any remediation work because it was still conducting operations on the

27

property and that the contamination issues would be addressed when the lease terminated. He could not say if the contamination levels of the individual substances exceeded twice background levels, but pointed to a September 24, 2010 letter from DEQ where that agency suggested that the residual contaminant concentrations did not exceed remediation standards for an industrial exposure scenario. In fact, based on DEQ's reaction to the RECAP plan submitted by M-I, if the plaintiffs would agree, the arsenic, barium, chromium, and lead found on the property need not be removed.

Byron Trahan is an environmental consulting engineer who was retained by M-I to prepare the RECAP plan. He explained that RECAP is a method of developing site-specific standards to determine if a site has soil or groundwater contamination. It tells a party what contamination must be cleaned up and what may be left in the ground. In the case of the 3.7 acres at issue in this litigation, he first initiated a site-history investigation to obtain the background information necessary to comply with the RECAP requirements. His primary sources of information were current M-I employees and DEQ's electronic document management system.

By July of 2009, Mr. Trahan was well aware that the site was contaminated with arsenic, barium, chromium, lead, zinc, and TPH. He also had knowledge of Mr. Kimbrell's findings of radium. Assuming the property was used solely for industrial purposes, Mr. Trahan prepared his RECAP recommendations to DEQ. As established by his testimony, the information presented to DEQ was significantly lacking in detail—much of the known history, and particularly the spill history, of the 3.7 acres was omitted. Additionally, the RECAP recommendations contained no information addressing the extent of the vertical contamination on the property. Mr. Trahan explained the absence of this

28

information by asserting that he had met with a representative of DEQ before preparing the report and was told that a general plan, rather than a more extensive and intensive work plan, would be sufficient for RECAP purposes. He suggested that RECAP has both general screening standards and site-specific screening standards, and that general standards were initially applicable to the 3.7-acre tract, but ultimately, site-specific standards were formulated.

Richard Goudeau, a biologist who formerly worked for DEQ, joined M-I in 2006. Because of his working relationship with DEQ, he assisted Mr. Trahan in implementing and presenting the RECAP document. He described RECAP as a guide which did not have to be followed to the letter. If DEQ accepted the RECAP presentation, M-I would be allowed to risk away any further contamination on the site, and DEQ would require no further remediation. However, he also acknowledged that significant historical data concerning prior spills was omitted from the RECAP document submitted to DEQ.

Although Brian Hunter, M-I's vice-president for Quality, Health, Safety, and Environment, had little personal knowledge of the problems at the 3.7-acre tract, he testified concerning M-I's company policies. He acknowledged that the 3.7 acres was contaminated with a number of substances commonly found in M-I's products or as a byproduct of its activities, but stated that M-I's policy is to avoid all spills big or small, toxic or harmless. Still, he acknowledged that contamination as a result of accidental discharges will occur in the course of M-I's business operations. With regard to the various DEQ regulations at issue in this litigation, he reasserted the company position that the regulations were intended to apply only to oil and gas drilling operations and not to a service company such as M-I. Also, it is M-I's policy to return the land to the owner in the same condition it was received.

29

Dr. Barbara Beck is from Cambridge, Massachusetts; has a Ph.D. in molecular biology and microbiology; and testified for M-I as an expert in toxicology. She explained that a toxicologist evaluates the effects of chemical compositions on humans, animals, and plants. In doing so, the toxicologist determines the harmful dose[11] of a particular chemical and compares it to the concentration of the chemical at the site and the risks resulting from human exposure. After preforming a risk assessment for the 3.7 acres, she concluded that there existed no excess risk to humans from the contaminated soil, even if the site was to be used for residential purposes. Dr. Beck reached this conclusion by calculating the degree of exposure over a thirty-year period and concluding that the contamination present was not in sufficient quantities to cause harm to humans.

Dr. Beck compared the contamination quantities present in the 3.7 acres to Environmental Protection Agency ("EPA"), not DEQ, screening levels and found that while arsenic, chromium, lead, TPH, and polycyclic aromatic hydrocarbons ("PAH") exceeded screening limits, there are no long-term dangers associated with this level of exposure. She concluded that benzene did not exceed the screening limits. With regard to radium, she found the overall readings to be at background levels and not elevated. In doing so, she considered the site as a whole and not any particular section of the property.

While Dr. Beck acknowledged that arsenic was the risk driver at the site, she suggested that removing the soil would be of no benefit because any replacement soil would also contain arsenic. In fact, she found no scientific reason for excavating any of the soil from the site. The fact that twenty percent of the

---

[11] The point at which exposure to a particular chemical becomes harmful.

30

property was covered by concrete would not cause her to change her mind because she would expect the same findings under the concrete as in the open areas.

John Tweedel is a radiation safety officer with Tiger Environmental, which is an environmental cleaning company specializing in production equipment cleanup, including equipment contaminated with NORM. On September 15, 2009, Mr. Tweedel cleaned the area where Mr. Kimbrell had found NORM during his inspection. In completing his DEQ-approved remediation plan, Mr. Tweedel excavated an area approximately thirty-by-forty feet on the surface and three feet deep. However, when he reached the three foot level and tested for NORM, he continued to record readings that were twice the background. In some areas, he stopped digging at fifty-seven inches below the surface, concluding that he had removed all radiation.

Pursuant to DEQ instructions, Mr. Tweedel returned to the site on March 30, 2010, and conducted a grid survey over the entire property for NORM. He found no additional locations where NORM exceeded two times background. However, he acknowledged that he was not able to test under the concrete slabs on the property.

Regarding M-I's policy concerning NORM, Mr. Tweedel testified that the standard operating procedure in the oil and gas industry is to have all materials from offshore screened for NORM before arriving onshore. Whether the material should be checked a second time once it arrives on shore, according to Mr. Tweedel, depends on where the material will ultimately be delivered. He personally believed that M-I had satisfied DEQ's NORM requirements.

Dr. John Frazier has a Ph.D. in physics and is a health physicist from Knoxville, Tennessee, and testified on behalf of M-I concerning the radiation levels on the 3.7-acre tract. He testified that all soils contain radioactive material,

31

but that in reviewing the material made available to him, including Mr. Kimbrell's work product, he found no indication of levels of radiation above background on the property that had not already been remediated. Dr. Frazier acknowledged that the area remediated by Mr. Tweedel contained NORM, but that the excavation of the area complied with DEQ regulations.

### *Legal Analysis*

The evidentiary record establishes that the 3.7-acre tract of land came to be owned by the Broussard and Vallee families in 1945. While there exists no evidence to establish the property's use between 1945 and August 1, 1955, the parties seem to generally agree that Mud Supply acquired possession of a relatively clean tract of land. From August 1, 1955, through May 17, 2005, when suit was filed, the property was continuously subjected to the wear and tear associated with the operation of businesses whose purpose was supplying the needs of the oil and gas drilling activity in the inland waterways and off the coast of Louisiana. First, Mud Supply operated a facility which stored, mixed, and supplied drilling rigs with drilling mud, a chemical composition which, by its very makeup, contains chemicals and elements not natural to the surrounding landscape. This business enterprise was both continued and supplemented when Dresser became the lessee of the property. By the time M-I took over as lessee on August 1, 1996, the activity had expanded to include facilities to store, recycle, and supply drilling rigs with recycled drilling mud and completion fluids. The introduction of these new operations also introduced the property to new possible contaminants. The nature of all three of these facilities includes the very real risk of accidental spills. Although one might argue that some of these spills could possibly have resulted in intentional efforts to cover up their occurrence, there exists no evidence in the record that any of these spills were intentional.

32

The plaintiffs set forth two basic arguments under which they claim the right to recover damages. The first is that M-I breached its lease contract such that the lease should be dissolved and the plaintiffs awarded damages for that breach. The second is that the contamination of the 3.7 acres occurred through the negligence of M-I and that the plaintiffs sustained damage as a result of that negligence. M-I, on the other hand, asserts firstly that the plaintiffs' appeal should be dismissed for failure to appeal the appropriate judgment, and secondly because it is premature. Assuming this court concludes that these arguments are without merit, M-I asserts that the trial court judgment should be affirmed. Because they address preliminary matters, we will first consider M-I's motion to dismiss the appeal and its sole assignment of error.

### *M-I's Partial Motion to Dismiss Appeal*

M-I argues that because the plaintiffs have only appealed from the February 10, 2011 judgment (as amended by the March 16, 2011 judgment), they have failed to appeal the trial court judgment denying the motion for JNOV and new trial. That being the case, and because most of the plaintiffs' assignments of error relate to the denial of the motion for JNOV and new trial, M-I argues that those assignments addressing the JNOV and new trial rulings should be dismissed. We find no merit in this assignment of error.

An appeal is taken by order, either oral or written, within the time delay allowed from a judgment rendered by the trial court. La.Code Civ.P. art. 2121. Furthermore, Rule 1-3, Uniform Rules—Courts of Appeal, provides:

> The scope of review in all cases within the appellate and supervisory jurisdiction of the Courts of Appeal shall be as provided by LSA-Const. Art. 5 § 10(B), and as otherwise provided by law. The Courts of Appeal will review only issues which were submitted to the trial court and which are contained in specifications or assignments of error, unless the interest of justice clearly requires otherwise.

33

In their motion for appeal, the plaintiffs listed the original and amended judgments, their motions for JNOV and new trial, and the trial court's judgment denying those motions. They subsequently requested that they be granted an appeal from the February 10, 2011 judgment, as amended on March 16, 2011. They did not specifically request an appeal from the April 6, 2011 trial court judgment denying their motion for JNOV and new trial. However, the failure to specifically request an appeal of the April 6, 2011 judgment does not, as advocated by M-I, automatically deny the plaintiffs the right to seek review of that judgment. Because the issue of the JNOV and new trial were obviously submitted to the trial court and, also, because the plaintiffs have specified their desire to appeal that judgment through their assignments of error, those issues are properly raised in the appeal. M-I's partial motion to dismiss is denied.

*Premature Suit*

In its only assignment of error, M-I argues that the plaintiffs' suit is for restoration damages and, as such, is premature because the lease between the parties is ongoing and does not terminate until July 31, 2016. We disagree.

The lease term relied on by M-I provides the following:

> 13.  LESSEE shall pay the rent as provided above, and at the expiration of the terms shall remove its goods and effects and peacefully yield up to the LESSORS said premises in as good order and condition as when originally delivered to it in 1955 excepting, however, ordinary wear and tear and damage or loss caused by casualty, war, insurrection, public disorder, act of any governmental authority, fire, [or] the elements.

We disagree with M-I's argument that the on-going lease between the parties renders the plaintiffs' claim premature. In *Marin v. Exxon Mobil Corp.*, 09-2368, 09-2371 (La. 10/19/10), 48 So.3d 234, the supreme court disagreed with Exxon's position, as mirrored by M-I, that any restoration obligation raised by a lease does not become effective until the lease terminates. Specifically, the supreme court

found that while certain obligations imposed by law may "only arise at the end of a lease," others "continue throughout the term of the lease and a lessor need not wait until the end of the lease to sue a lessee for damage to his property." *Id.* at 256. We acknowledge that *Marin* is factually distinguishable from the matter before us because it involved an attempt to recover damages caused to a part of the property subject to an oil and gas lease, but which was also used for growing sugar cane, while the matter before us concerns property that is all being used by the lessee for its purposes. However, we find this discrepancy to be a distinction without a difference. In both cases, the plaintiffs attempted to recover damages for contamination to their property arising from ongoing activity.

M-I also argues that *Marin* does not apply in this instance because the lease between the plaintiffs and Exxon in *Marin* did not contain a restoration obligation, unlike the defendant's lease with the plaintiffs. However, although the original lease in *Marin* did not contain a restoration provision, the plaintiffs in that case executed a novation of the original lease in 1994, and entered into a new agreement which provided: "LESSEE shall restore the leased premises as near as reasonably practicable to its present condition and shall be liable for any damage to the surface of the land by reason of LESSEE's use during the term of this Lease." *Id.* at 258. Thus, the 1994 version of the *Marin* lease did contain a restoration provision.

We find no merit in this assignment of error.

***Plaintiffs' First Assignment of Error***

In this assignment of error, the plaintiffs assert that the trial court erred in rejecting its motion for JNOV addressing their negligence claim. Specifically, the plaintiffs argue that the jury erred in concluding that M-I's negligence was not a legal cause of the damage to their property because M-I conceded causation throughout the trial.

35

We evaluate a negligence claim under a duty-risk analysis. This is a five-step process which requires that a party, asserting the fault of another, establish the following:

> (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) the actual damages (the damages element). A negative answer to any of the inquiries of the duty-risk analysis results in a determination of no liability.

*Lemann v. Essen Lane Daiquiris, Inc.*, 05-1095, p. 7 (La. 3/10/06), 923 So.2d 627, 633 (citations omitted).

In this case, the jury was not presented with a five-step interrogatory to determine the negligence issues. Instead, Interrogatory Number Two simply asked whether "the Defendant was negligent with respect to the described property[,]" and Interrogatory Number Three asked whether "the Defendant's negligence was a cause of any damage to the Plaintiffs' property[.]" Thus, the first two elements of the duty-risk analysis are included in Interrogatory Number Two, and the remaining three elements are included in Interrogatory Number Three.

With regard to the duty or duties M-I owed the lessors, the trial court instructed the jury that M-I's actions were to be considered with regard to "that of a reasonably prudent person under the circumstances[.]" Additionally, the trial court instructed the jury that pursuant to La.Civ.Code art. 2317, with some modifications, "[w]e are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody." Additionally, the trial court instructed the jury that La.Civ.Code art. 2317.1 provides in pertinent part:

> The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he

36

knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care.

The jury did not record its answer to Interrogatory Number Two, but recorded its answer to Interrogatory Number Three in the negative. However, because the instruction to the jury was to the effect that it should not consider Interrogatory Number Three unless it answered Interrogatory Number Two finding that M-I was negligent, we interpret the two interrogatories together to conclude that the jury answered Interrogatory Number Two in the affirmative but inadvertently failed to mark the answer. That being the case, the jury found for the plaintiffs on the first and second elements of the duty-risk analysis, but found for M-I on at least one of the remaining three elements of the duty-risk analysis.

In rejecting the plaintiffs' motion for a JNOV, the trial court found that the facts and inferences did not point so strongly and overwhelmingly in favor of the plaintiffs that reasonable persons could not arrive at a contrary verdict. *Joseph*, 772 So.2d 94. While the interrogatory was not couched in a manner which would indicate exactly which of the final three elements the jury found were not proven by a preponderance of the evidence, we can envision a number of scenarios under which the jury might reach a negative finding on one or more of the last three elements. The most logical is that given the conflicting nature of the evidence, particularly the expert evidence, the jury could conclude that M-I's failure to act as a reasonably prudent operator under the circumstances caused the plaintiffs no damage. In fact, Mr. Broussard testified that the plaintiffs had yet to suffer any damages as of the time of trial, and that their principal concern involved what might happen at the end of the lease if M-I did not live up to its contractual obligations.

37

While another trier of fact might have reached a different conclusion, we find no manifest error in the jury's conclusion on the negligence issues and, therefore, no manifest error in the trial court's denial of the plaintiffs' motion for JNOV on this issue.

For the same reasons, we find no abuse of discretion in the trial court's refusal to grant the plaintiffs a new trial on this issue. *Id.* Thus, we find no merit in this assignment of error.

### *Plaintiffs' Second Assignment of Error*

In this assignment of error, the plaintiffs assert that if this court were to find that the jury's verdict did not result in a finding of negligence because of the failure of the jury to mark its answer to Interrogatory Number Two, it should find that the trial court erred in denying their motion for new trial and grant a new trial based on the supreme court's decision in *Wegener v. Lafayette Insurance Co.*, 10-810, 10-811 (La. 3/15/11), 60 So.3d 1220. Having found that the jury verdict did result in a finding of negligence on the part of M-I, we need not consider this assignment of error.

### *Plaintiffs' Third Assignment of Error*

In this assignment of error, the plaintiffs argue that the trial court erred in failing to properly instruct the jury on the applicability of both Louisiana's pre-1996 strict-liability statute and negligence per se. However, based on our finding that the jury verdict did find negligence on the part of M-I and Mr. Broussard's testimony that the plaintiffs have not yet suffered any damages, this argument is rendered moot. Thus, we find no merit in this assignment of error.

### *Plaintiffs' Fourth Assignment of Error*

In this assignment of error, the plaintiffs assert that the trial court erred in denying their motion for JNOV on the contract claim because the record contains

"overwhelming evidence" that M-I breached the lease through multiple statutory and regulatory violations and through conducting unauthorized operations on the property.

Louisiana Civil Code Article 2668 provides in pertinent part that a "[l]ease is a synallagmatic contract by which one party, the lessor, binds himself to give to the other party, the lessee, the use and enjoyment of a thing for a term in exchange for a rent that the lessee binds himself to pay." The lease between the plaintiffs and M-I is categorized as a commercial lease in that the 3.7-acre tract was "to be used for business or commercial purposes." La.Civ.Code art. 2671. With regards to the obligations of the lessee, La.Civ. Code art. 2683 provides the following:

> The lessee is bound:
>
> (1) To pay the rent in accordance with the agreed terms;
>
> (2) To use the thing as a prudent administrator and in accordance with the purpose for which it was leased; and
>
> (3) To return the thing at the end of the lease in a condition that is the same as it was when the thing was delivered to him, except for normal wear and tear or as otherwise provided hereafter.

The timely payment of rent is not an issue in this litigation, and the condition of the property upon its return would only become an issue if we determine that the lease should be dissolved. Thus, La.Civ.Code art. 2683(2) is the focus of this litigation.

The jury was not asked whether M-I performed under the lease as a prudent administrator. Instead, the jury was provided a single compound interrogatory and asked whether the plaintiffs established "by a preponderance of the evidence that the Defendant is in breach of the 'Commercial Lease' *and* caused damage to the Plaintiffs' property?" (emphasis added.) The negative answer to this interrogatory leaves open the question of whether the jury determined that M-I did not breach the lease, or breached the lease but that the plaintiffs suffered no damage.

39

The plaintiffs assert on appeal that M-I breached the lease in two ways: (1) by committing multiple statutory and regulatory violations; and (2) by conducting manufacturing operations on the property which violated the "Material Storage and Distribution and purposes incidental thereto" clause of the lease. We will consider the second of these assertions first.

Louisiana Civil Code Article 2686 provides, in pertinent part, that "[i]f the lessee uses the thing for a purpose other than that for which it was leased . . . the lessor may obtain injunctive relief, dissolution of the lease, and any damages he may have sustained." However, we do not find that to be the case here. Although Mr. Broussard testified that the lease was not intended to allow the mixing of chemicals on the property, it is clear that since the original lease in 1955, the mixing process has been an integral part of the commercial activity of all lessees, whether the activity involved mixing drilling mud from scratch or recycling mixing mud or completion fluids. It would not be manifest error for a jury to conclude that, given the history of the use of the property and the number of separate documents executed during that history, the mixing activity now complained of by the plaintiffs was clearly authorized pursuant to the language found in M-I's lease. Of particular significance with regard to this litigation is the undisputed fact that the three mixing activities were being performed on the property when the plaintiffs executed the lease with M-I.

Given that the incidental and essential activity (the mixing processes) has been accepted activity since 1955, the trial court could conclude that the facts and inferences did not point so strongly and overwhelmingly in favor of the plaintiffs that reasonable persons could not have determined that M-I's activity in this regard was not a breach of the lease. *Joseph*, 772 So.2d 94. While another trier of fact might well have reached a different conclusion, we find no manifest error in the

40

jury's conclusion that M-I did not conduct unauthorized manufacturing activities on the property and, therefore, no manifest error in the trial court's denial of the plaintiffs' motion for JNOV on this issue. For the same reasons, we find no abuse of discretion in the trial court's refusal to grant the plaintiffs a new trial on this issue. *Id.*

The same rationale applies to the plaintiffs' other complaint that M-I breached the lease by multiple statutory and regulatory violations. With regard to this particular argument as it relates to M-I's NORM policy, the jury was faced with conflicting testimony concerning whether DEQ's regulations even applied to M-I's activities on the property. The plaintiffs' witnesses testified that those regulations did apply while M-I's witnesses took the opposite position. Additionally, M-I presented testimony to the effect that, while its company policy concerning NORM looks flawed on the surface, the industry standard was that the recyclable material delivered to M-I should have been tested for NORM before it left the offshore or inland waterway rigs, and M-I should have been able to rely on that testing. In fact, it appears that the only appreciable NORM contamination occurred in one spot on the property and, when discovered, was removed. Violations of discharge permits appear in the record, but all are of the accidental variety. Thus, there is no evidence that M-I intentionally breached any state statutes or regulations during its tenure as lessee.

Given the record before it, the trial court could determine that the facts and inferences did not point so strongly and overwhelmingly in favor of the plaintiffs that reasonable persons could not conclude that M-I did not breach the lease by multiple statutory and regulatory violations. *Joseph*, 772 So.2d 94. While another trier of fact might well have reached a different conclusion, we find no manifest error in the jury's conclusion that M-I did not breach the lease by multiple

41

statutory and regulatory violations and, therefore, no manifest error in the trial court's denial of the plaintiffs' motion for JNOV on this issue. For the same reasons, we find no abuse of discretion in the trial court's refusal to grant the plaintiffs a new trial on this issue. *Id.*

We find no merit in this assignment of error.

### *Plaintiffs' Fifth Assignment of Error*

In this assignment of error, the plaintiffs argue that the trial court erred in denying their motion for a new trial on the basis of M-I's significant discovery abuse. However, in reviewing this issue, we find that not one of the peremptory grounds exists for granting a motion for new trial pursuant to La.Code Civ.P. art. 1972. We further find no abuse of discretion on the part of the trial court in denying the plaintiffs' motion pursuant to La.Code Civ.P. art. 1973, which allows the grant of a new trial if good grounds exist for doing so. In denying the plaintiffs' request for sanctions for M-I's failure to turn over environmental audits pertaining to the site, the trial court held that M-I had satisfactorily attempted to meet plaintiffs' requests and that the audits were not crucial to the plaintiffs' case. Accordingly, we find no abuse of discretion in the trial court's denial of the plaintiffs' motion for new trial on the basis of M-I's alleged discovery abuse.

### *Plaintiffs' Sixth Assignment of Error*

In this assignment of error, the plaintiffs argue that the trial court erred in denying the admission of evidence pertaining to M-I's other bad acts at other locations, pursuant to La.Code Evid. art. 404(B)(1) to prove factors such as motive, intent, knowledge, or absence of motive or accident and to support of their request for exemplary damages. However, because the trial court's ruling on this issue was reversed on writ by this court and then reinstated by the Louisiana Supreme Court, we decline to revisit this issue. *See unpublished writs Broussard v. Martin*

42

*Operating P'ship*, 10-1535 (La.App. 3 Cir. 12/29/10), *writ granted*, 10-2874 (La. 1/3/11). Our affirmation of the jury verdict and the trial court judgment further supports our decision not to revisit this subject. Accordingly, we find no merit in this assignment of error.

*Plaintiffs' Seventh Assignment of Error*

In this final assignment of error, the plaintiffs assert that the trial court erred in dismissing their entire claim for statutory damages under La.R.S. 30:2276(G)(3). We find no merit in this assignment of error. That statute provides for the recovery remedial costs incurred by a person "responding to a discharge or disposal of a substance covered by [Chapter 12 of Title 30 of the Revised Statutes]." No remedial costs have been incurred by the plaintiffs.

### *Future Cleanup Under the Lease*

In affirming the jury verdict and the trial court's denial of the plaintiffs' motion for JNOV and for new trial, we do not reach the issue of the degree of cleanup required at the end of the M-I lease. The testimony presented by the experts on both sides of this litigation makes clear that the degree of cleanup required by the regulatory agencies and those required under contract are not one and the same, and that if a party contracts to a more stringent cleanup standard than that required by the regulatory agencies, the more stringent standard will be applicable. That being the case, we do not construe the jury verdict nor the subsequent trial court rulings to suggest that M-I has or has not complied with the obligations which will arise at the end of this commercial lease.

### DISPOSITION

For the foregoing reasons, we reject the motion to dismiss the appeal filed by the defendant, M-I, LLC d/b/a M-I Drilling Fluids LLC and M-I SWACO. We affirm the jury and trial court judgment in favor defendant, M-I, LLC d/b/a M-I

43

Drilling Fluids LLC and M-I SWACO, dismissing the claims of the plaintiffs, Whitestone, Inc. and Vallee Land Company, LLC, the remaining plaintiffs at trial. We assess all costs of this appeal to Whitestone, Inc. and Vallee Land Company, LLC.

**AFFIRMED.**